The Freeman Building Company (formerly Freeman Stores, Inc.) v. Commissioner.Freeman Bldg. Co. v. CommissionerDocket No. 16692.United States Tax Court1949 Tax Ct. Memo LEXIS 273; 8 T.C.M. (CCH) 186; T.C.M. (RIA) 49052; February 3, 1949*273 Petitioner, a Minneapolis department store, claimed a deduction of $38,000 in each of the fiscal years ending January 31, 1943, and January 31, 1944, representing salaries paid to its president and vice-president. These officers, who were husband and wife, owned substantially all of petitioner's outstanding stock. Respondent disallowed $16,000 of the $38,000 claimed by petitioner for compensation in each fiscal year. Held, the amount which petitioner is entitled to claim for salaries paid to its officers in each of the taxable years determined. H. E. Maag, Esq., Rand Towers, Minneapolis, Minn., for the petitioner. T. A. Steele, Jr., Esq., for the respondent. ARUNDELLMemorandum Findings of Fact and Opinion This proceeding involves the following deficiencies in income, declared value excess profits, *274 and excess profits taxes for the fiscal years ended January 31, 1943, and January 31, 1944: Taxes19431944Income$ 218.51$ 18.49Declared value excessprofits2,354.171,249.39Excess profits13,204.0216,109.48The sole question presented is whether the Commissioner erred in disallowing $16,000 of a deduction of $38,000 claimed by petitioner for salaries paid to two of its officers during each of the fiscal years ending January 31, 1943, and January 31, 1944. Only those portions of the deficiencies which arise because of the disallowance of officers' salaries are challenged by the petitioner. Petitioner concedes the correctness of all other adjustments made by respondent in respect to its tax liability for the years in question. The facts stipulated by the parties are incorporated herein and, insofar as necessary to the disposition of the issue, are set forth in our findings of fact. Findings of Fact The Freeman Building Company, hereinafter referred to as the petitioner, is a Minnesota corporation with its principal place of business in the City of Minneapolis. During the years in question, its books were kept on the accrual basis for fiscal*275 years ending on January 31st of each year, and its Federal tax returns were filed with the collector of internal revenue for the district of Minnesota. In July, 1944, the petitioner sold its business to the Scott-Burr Stores Corporation of Chicago. On October 10, 1944, petitioner's name was changed from Freeman Stores, Inc., to Freeman Building Company. The business conducted by petitioner during the taxable years in question was located in an industrial neighborhood on the outskirts of Minneapolis and consisted of a general drygoods store, including men's furnishings and shoes. The business was started by Elmer B. Freeman at its present location in 1917 and was incorporated in 1936. In 1917 E. B. Freeman leased the ground floor of the present building, which consisted of approximately 3,500 square feet, and thereafter engaged in the business of selling clothing, shoes, and millinery. In 1919, he was married to Harriet P. Freeman. Thereafter, departments for women's clothing and drygoods were added and Harriet joined her husband in the operation of the business. Prior to her marriage Harriet had worked as a saleslady and buyer in a ready-to-wear department of another Minneapolis*276 department store. After her marriage she took over the operation and supervision of the petitioner in those departments other than men's furnishings, men's clothing and shoes, over which E. B. Freeman retained supervision. During the taxable years here involved, E. B. Freeman and Harriet P. Freeman were president and vice-president, respectively, of the petitioner, and out of 800 shares of the total corporate stock outstanding at the end of the taxable year January 31, 1943, 730 shares were held in the name of E. B. Freeman, 10 shares in the name of Harriet P. Freeman, and 60 shares in the name of E. K. Wilcox. At the end of the taxable year ended January 31, 1944, 789 shares were held in the name of E. B. Freeman, 10 shares in the name of Harriet P. Freeman, and one share in the name of Frances Fischer. Petitioner's business expanded and during the taxable years in question it occupied the entire basement and the first and second floors of the building in which it was located. The departments of the business supervised by Harriet included ladies' ready-to-wear, including furs; millinery; drygoods; house furnishings, including linens, lamps, rugs and bedding; and house dresses*277 and hosiery. She did most of the buying, had charge of display, examined and supervised the checking and pricing of merchandise and handled the advertising connected with these departments. In this work she had the assistance of a number of reliable and experienced employees. Following the outbreak of war, petitioner found it difficult to obtain goods to satisfy customer demand, and Harriet, during each of the taxable years, made an extra trip east for the purpose of purchasing merchandise. Harriet worked regular hours at the store except for periods when she attended sales conducted by various sellers at Minneapolis hotels. During these sales, which were held three or four weeks each year, she would often work until 11 o'clock at night. In addition, she made purchases from a number of salesmen who called at the store. The entire responsibility for the operation of the store rested on E. B. Freeman. He handled the financial affairs, contracts, alterations, and was in complete charge of personnel. He did the buying for the men's clothing department and supervised the shoe department. He opened the store at 8 a.m., and closed the store every night at 6:30 p.m. During the years in*278 question he returned to the store and remained until 11 o'clock each night, checking out the day's receipts. He did much of the carpenter work and changed wiring, lighting, and shelving involved in setting up and moving departments within the store. He was in charge of buying, advertising, and display for the departments under his supervision and in busy periods acted as clerk. The number of persons employed by petitioner during the taxable years involved averaged between 40 and 45. This number was substantially the same as were employed by petitioner during prior years. Due to the war petitioner lost many of its experienced employees which it found difficult to replace and as a result additional work was required of both E. B. and Harriet Freeman during 1942 and 1943. Harriet P. Freeman died in September, 1944. Amounts designated as officers' salaries and paid by petitioner for the years 1937 to 1944, inclusive, were as follows: E. B.Harriet P.FreemanFreemanTotal1-31-37$12,000.00$ 6,000.00$18,000.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,000.006,000.0018,000.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,000.006,000.0018,000.001-31-406,000.006,000.0012,000.001-31-419,000.007,500.0016,500.001-31-428,000.008,000.0016,000.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,000.0018,000.0038,000.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,000.0018,000.0038,000.00*279 The only dividends paid by petitioner during the period from 1937 to 1944, inclusive, were as follows: January 31, 1937$12,400.00January 31, 19398,000.00Petitioner's capital and surplus accounts for the taxable years ending January 31, 1942, 1943, and 1944, were as follows: Item1-31-421-31-431-31-44Capital, books$ 80,000.00$ 80,000.00$ 80,000.00Surplus, books51,237.4764,316.8380,797.79Totals$131,237.47$144,316.83$160,797.79The following schedule of accounts was compiled from petitioner's Federal income and excess profits tax returns without regard to subsequent adjustments: Net IncomeSalariesFiscalbeforeTotal Taxesand WagesYearGrossOfficers'Officers'RemainingPaid on thisother thanEndedSalesCompensationSalariesNet IncomeNet IncomeOfficers'1/31/37$343,306.25$ 31,939.84$18,000.00$13,939.84$ 1,680.30$39,820.001/31/38357,013.6524,100.4018,000.006,100.401,015.6545,640.041/31/39302,353.5923,891.9218,000.005,891.92743.9239,042.681/31/40288,986.9722,348.5712,000.0010,085.741,348.5736,051.701/31/41301,439.6824,998.4316,500.008,498.431,319.7638,315.001/31/42370,417.0033,768.5416,000.0017,768.544,565.3142,836.091/31/43471,422.5379,287.4938,000.0041,287.4927,932.5746,107.351/31/44534,132.25101,447.9238,000.0063,447.9246,803.7246,223.96*280 In the deficiency notice in the instant case, the Commissioner held the salaries of $20,000 and $18,000 paid to E. B. Freeman and Harriet P. Freeman, respectively, during the fiscal years ended January 31, 1943, and January 31, 1944, were excessive to the extent of $8,000 in the case of each. Accordingly, in each taxable year the Commissioner disallowed the amount of $16,000 of the deduction of $38,000 claimed by petitioner in those years for officers' salaries. The reasonable allowance for salaries for personal services rendered to the petitioner during each of the taxable years in question by E. B. Freeman and Harriet P. Freeman was $18,000 and $10,000, respectively. Opinion ARUNDELL, Judge: The sole issue herein is whether the respondent was correct in disallowing, under section 23(a)(1)(A) of the Internal Revenue Code, 1 a portion of the deductions claimed by the petitioner for salaries paid during each of the taxable years involved to its president and vice-president who owned nearly all of the outstanding stock of petitioner. *281 The salaries received by E. B. Freeman and Harriet Freeman for the year ending January 31, 1942, were increased from $8,000 each to $20,000 and $18,000, respectively, for the years ending January 31, 1943 and January 31, 1944. This action represented salary increases of $12,000 for E. B. Freeman and $10,000 for Harriet Freeman. As is stated in Regulations 111, section 29.23(a)-C, 2 "It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." We are fortunate in having in the record before us evidence produced by respondent as to the salaries paid executives of other department stores and the salary paid the manager who assumed control of petitioner's business after its acquisition by the Scott-Burr organization in July, 1944. *282 One such executive, who was general manager and executive vice-president of a large department store in the downtown shopping area of Minneapolis, received salaries of $14,000 in 1942 and $16,000 in 1943. He held 112 of the store's 1,300 or 1,400 outstanding shares and in each year received, in addition to salary, several thousand dollars in dividends. The store was considerably larger than the petitioner, occupying five floors, with gross sales of approximately $2,600,000. The manager had under his direct supervision 175 to 275 employees, supervised merchandising, advertising, and was responsible for the financial affairs of the business. He handled an estimated 80 per cent of the buying and traveled extensively throughout the country during each year for this purpose. Respondent also produced an executive who was manager and secretary-treasurer of a smaller department store in Alexandria, Minnesota. This executive owned 95 of the store's 605 outstanding shares. The remaining stock was owned by his wife and father-in-law. He was paid a salary of $15,000 in 1942 and in 1943. This store, which consisted of two floors and a half basement, was slightly smaller than petitioner. Its*283 gross sales for 1942 and 1943 were approximately $297,000 and $350,000, respectively. Its manager had under his supervision approximately 26 employees in each year, had complete charge of the business, advertising, and supervised all the buying in connection with which he did extensive traveling. The manager who succeeded to the control of petitioner's business after its purchase by the Scott-Burr organization in July, 1944, received a salary of $9,500 for 1944, $10,000 in 1945, and $13,050 in 1946. The new manager owned no stock in the Scott-Burr Corporation. He testified that at present he has 27 or 28 employees, including 12 or 13 who worked for the petitioner. He is personally responsible for 90 per cent of the buying, has charge of personnel, display, charge accounts, and the complete control of the business. Gross sales of the business were $350,000 for the last half of 1944 and $570,000 and $630,000 for 1945 and 1946, respectively. We are of the opinion that petitioner was justified in increasing the salary of E. B. Freeman over the $8,000 he received in 1942. He had founded the business in 1917 and since that time had devoted his entire efforts to its affairs. Throughout*284 its existence he carried the complete responsibility for the operation of the store, handled its financial affairs, contracts, alterations, and was in complete charge of personnel. In addition, he did the buying for the men's clothing department and personally supervised the shoe department. During the years in question, the gross sales and net income of the business rose to a point far in excess of the pre-war average. The record does not disclose whether the greatly increased revenue of petitioner was due to the efficient management of E. B. Freeman or to the impact of war conditions. However, it is clear that following the outbreak of war he was required to work longer and harder in the business and was obliged, due to the increase in business and the loss of experienced help, to render services greatly in excess of those he had performed in prior years. After careful consideration of all these facts, we are of the opinion that the reasonable compensation for the services of E. B. Freeman to the petitioner in each of the years in question was $18,000. As for Harriet Freeman, petitioner cites in support of the salaries paid to her the various duties she performed in the store. *285 At the same time petitioner points out that E. B. Freeman exercised complete over-all management of the business. The latter fact, which is substantiated by the evidence, would indicate that Harriet Freeman occupied a position subordinate to that of her husband. It also appears that she had the assistance of a number of experienced and capable employees in assisting her in her work. It is doubtful that under such circumstances unrelated stockholders would have assented to the petitioner's paying her the salary of $18,000 which was almost equal to that paid to her husband. It is also interesting to note that no position equivalent to that held by Harriet was maintained by Scott-Burr after its purchase of the business. It also appears that she performed little additional work during the taxable years over what she had previously rendered to the business. Her husband testified that except for three or four weeks a year when she attended sales in downtown hotels she worked only her regular hours at the store. He also testified that "possibly she took an extra trip east during those war years, one trip more than she usually did." It is our opinion that petitioner has not shown that*286 $10,000, the amount fixed by respondent, was not adequate compensation for the services rendered by Harriet Freeman to the petitioner during these years. Therefore, the respondent's allowance of this amount must be sustained. Decision will be entered under Rule 50. Footnotes1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *.↩2. SEC. 29.23(a)-6. Compensation for Personal Services. - Among the ordinary and necessary expenses paid or incurred in carrying on any trade or business may be included a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. * * * (2) The form or method of fixing compensation is not decisive as to deductibility. * * * (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. * * *↩